**Richard R. Best**
**Sanjay Wadhwa**
**George N. Stepaniuk**
**Cynthia A. Matthews**
**New York Regional Office**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-0132 (Matthews)**
Email: matthewsc@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : Civil No. |
| Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| **CHAD CALICE and** | : |
| **HOLLY HAND,** | : |
| | : |
| | : |
| Defendants. | : |
| | : |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Chad A. Calice ("Calice") and Holly Hand ("Hand") (collectively, "Defendants"):

## SUMMARY OF ALLEGATIONS

1. This action involves insider trading violations by Calice and Hand in connection with the sales of shares of Neuralstem, Inc., currently known as Palisade Bio, Inc. ("Neuralstem"), by Calice and his uncle ("Relative A") before Neuralstem's July 25, 2017

announcement of negative clinical trial results for one of the two drugs it had in development at the time (the "Announcement"). Hand, Neuralstem's senior project manager overseeing the trial, learned of the negative news on the Friday before the Announcement and tipped Calice about it later that day.

2. Hand and Calice lived together, owned their home jointly, shared a mortgage on that home, and held a joint bank account. Calice knew that Hand was the project manager on the clinical trial and that any internal company information she shared with him was confidential. Hand knew that Calice held Neuralstem stock and would lose money when the negative clinical trial results were publicly disclosed if he did not sell his stock beforehand.

3. Calice liquidated his entire Neuralstem position the following Monday (July 24, 2017), the day before the Announcement, while in possession of material nonpublic information obtained from Hand about Neuralstem's negative clinical trial results. While selling his own shares, Calice tipped Relative A, with whom Calice had a close relationship. Calice knew that Relative A owned Neuralstem stock and would lose money when the negative clinical trial results were publicly disclosed if Relative A did not sell his stock beforehand. Relative A also sold all of his Neuralstem shares that day, immediately after receiving the tip from Calice.

4. Neuralstem's share price dropped approximately 50% following the Announcement. By selling their stock before the Announcement, Calice avoided losses of approximately $103,875 and Relative A avoided losses of approximately $14,434.

5. By virtue of the conduct alleged herein, both of the Defendants, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless the

Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein.  In addition, the Commission seeks a final judgment ordering the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Neuralstem's common stock traded on the NASDAQ Stock Market, which was headquartered in New York, New York during the relevant period, and relevant conduct, transactions and events constituting or giving rise to the alleged violations therefore occurred in the Southern District of New York.  In connection with the conduct alleged in this complaint, Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, or of the facilities of a national securities exchange.

**THE DEFENDANTS**

9.  **Hand**, age 35, currently resides in Chenango Forks, New York, where she lives with Calice. Hand was a senior project manager for clinical trials at Neuralstem during the relevant time, and she subsequently worked as a clinical project director at another pharmaceutical company.

10. **Calice**, age 34, currently resides in Chenango Forks, New York, where he lives with Hand. He is a veterinarian and the principal and owner of Calice Veterinary Services, Inc., through which he conducted the trading at issue. Calice is a nephew of Relative A.

**RELEVANT ENTITY AND INDIVIDUAL**

11. **Neuralstem**, currently known as Palisade Bio, Inc., is a biopharmaceutical company incorporated in Delaware, with a principal place of business in Carlsbad, California. During the relevant period, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Stock Market under the symbol CUR. It currently trades on the NASDAQ Capital Market under the symbol PALI.

12. **Relative A**, age 73, is a retired math teacher and Calice's uncle.

**THE DEFENDANTS' INSIDER TRADING VIOLATIONS**

**Background**

13. Neuralstem's business was focused on developing central nervous system therapies based on its neural stem cell technology. In May 2016, the company began a double-blinded Phase 2 clinical study to determine the efficacy of NSI-189, an antidepressant that was one of the company's two lead assets under development.

14. Under industry standards and Neuralstem's written protocol for the study, the study data and its results were to be kept confidential until disclosed to the public. Neuralstem's

written clinical trial plan and study protocol, detailing the confidentiality procedures and timeline of the study, were put into effect on May 18, 2016.  In mid-May 2017, the company reported that the study had been completed and the data was ready to be analyzed.

15. On Thursday, July 20, 2017, that analysis -- the study's "top line" results -- was made available by secure server to the company's Chief Science Officer ("CSO") and an outside biostatistician for validation.  The company simultaneously imposed a "quiet period" prohibiting all employees and consultants associated with the trial, from disclosing any information related to the trial data or its results.

16. The results were made available to Neuralstem's CEO and an outside medical consultant later that day and shared over the following weekend only with those working on the press release that would disclose the trial results to the public.

17. On Tuesday, July 25, 2017, before the market opened, the company made the Announcement, publicly disclosing that the study had not met its primary efficacy endpoint, *i.e.* the data did not show that the treatment was effective.  The price of Neuralstem shares dropped approximately 50% on the news, from the previous day's close of $5.58 to $2.81 per share.

18. At the time of these events, Hand worked as the senior project manager of clinical trials at Neuralstem and oversaw the NSI-189 clinical trial.

19. Hand knew and understood the industry and company standards for confidentiality to which she was subject with respect to such studies, and specifically that she was prohibited from disclosing the results of this trial to anyone outside the company before the results were made available to the general public.

20.     As an employee of Neuralstem, Hand owed a duty to Neuralstem's shareholders to safeguard material nonpublic information that belonged to the company. This included confidential information about the the NSI-189 clinical trial.

21.     As recently as February 6, 2017, Hand had signed the company's confidentiality agreement and annual acknowledgements agreeing to comply with Neuralstem's insider trading policy and ethics code.

22.     Neuralstem's insider trading policy prohibited employees aware of material nonpublic information from purchasing or selling its securities, or tipping others, and from disclosing such information to outsiders, unless authorized to do so for a business purpose. The company's employee handbook and ethics code required that employees maintain the confidentiality of all nonpublic information and not use the nonpublic information except for the company's benefit.

23.     In the event that an employee disclosed confidential information to an outsider, the company's confidentiality agreement and code of ethics required the company to obtain from that outsider a written agreement to comply with the company's insider trading policy and/or sign a confidentiality agreement. Employees were advised to consult with the CFO (designated the Insider Trading Compliance officer) with questions or concerns.

**Hand's Relationship With Calice**

24.     Hand and Calice have lived together for many years. At the time of the relevant events, they owned their home jointly and shared the mortgage on that home, held a joint bank account, and were planning to buy a new home together.

25.     Hand frequently discussed her work with Calice. As a result, Calice knew about the projects that Hand worked on, her deadlines, when she had meetings, and, specifically with

respect to a clinical study, the key dates for the study and their significance. Calice knew from Hand that she was the project manager on the NSI-189 clinical trial, and they both knew, or were reckless in not knowing, that the trial data and its results were confidential until such time as they were disclosed to the public.

**Hand's Disclosure Of The Negative Clinical Trial Results To Calice**

26.     Neuralstem's written protocol for the NSI-189 clinical trial specifically prohibited Hand from accessing the trial data or results.

27.     However, on Friday, July 21, 2017, Hand learned of the trial's negative efficacy results from her supervisor, Neuralstem's CSO, who called around lunchtime to tell her the news. That morning, the CSO had also emailed her a link to the company's secure file share program that included graphs with subtext from which she could determine that the trial results were negative.

28.     Based on her experience, Hand anticipated that Neuralstem would make the clinical trial results public on the following Tuesday morning (July 25), via a company press release. The clinical trial results constituted material nonpublic information until they were publicly disclosed, and Hand knew so.

29.     Nevertheless, Hand disclosed the negative clinical trial outcome to Calice over the phone later that Friday afternoon (July 21). In addition to telling Calice about the negative clinical trial outcome, Hand conveyed to Calice her significant concerns about its potential adverse impact on the company's business prospects and her own employment status.

30.     As Hand knew, there was no corporate or business purpose for disclosing Neuralstem's confidential trial results to Calice, and in doing so, Hand violated Neuralstem's

insider trading policy, code of ethics, written clinical trial protocol, and the company imposed quiet period.

31.     In doing so, Hand also breached her confidentiality agreement with Neuralstem and violated her duty of confidentiality to Neuralstem, and she did so for her own personal benefit because of her close personal and financial relationship with Calice, and with the expectation of providing a benefit to Calice.

32.     When Hand conveyed material nonpublic information about the NSI-189 clinical trial results to Calice, Hand knew, or recklessly disregarded, that Calice would use that information to trade securities.

33.     Hand knew that Calice had purchased Neuralstem stock earlier in 2017, while the clinical trial was ongoing, and that Calice would lose money when the negative clinical trial results were publicly disclosed if he did not sell his stock beforehand.

34.     When Hand disclosed the negative trial results to Calice on July 21, 2017, she did not ask or warn him to maintain the confidentiality of the information and to refrain from trading.  Nor did Hand take any other corrective steps with respect to her disclosure, as required by the company's confidentiality rules and code of ethics, or consult with the CFO.

35.     In fact, when Hand was questioned by Neuralstem about Calice's inclusion on a list of names that the Financial Industry Regulatory Authority sent to Neuralstem in its review of suspicious pre-Announcement trading, Hand falsely stated that Calice could not have obtained the negative clinical trial information from her.

**Calice's Unlawful Trading**

36.     On the following Monday, July 24, 2017, Calice liquidated his entire Neuralstem position while in possession of the material nonpublic information about Neuralstem that he had

received from Hand. Calice and Hand were in frequent communication by phone and text throughout the day and communicated about the stock price.

37. Hand began checking the stock price that morning, while Calice had already logged on to his brokerage account twice by the time the market opened, and the two of them spoke on the phone at around that time.

38. Neuralstem's stock price rose that morning from $5.50 at the open to what would be the day's high price of approximately $6.05 at around 11:02 a.m.

39. Hand called Calice at 10:57 a.m. and also texted Calice about the stock price, telling him that it was "moving quickly" and referencing the $6.05 price. Calice placed his first sell order – a $6.00 limit order – at approximately 11:20 a.m.

40. Calice sold the remainder of his Neuralstem position throughout the day, through decreasing limit orders as the stock price began to drop. Calice spoke with Hand immediately before or after placing each order, and right after he fully liquidated his shares.

41. By selling all 36,058 shares of his stock on the day before the Announcement at prices ranging from $6.00 to $5.45 per share, Calice avoided losses of $103,875. Calice then immediately reinvested in Neuralstem on the very next day, buying 4,000 shares of the stock at the post-Announcement price of $2.82 per share.

42. Calice sold his Neuralstem stock on July 24, 2017 while in possession of information that he knew, or was reckless in not knowing, was material and nonpublic, and that he knew, or was reckless in not knowing, was communicated to him by Hand in breach of her duty of confidentiality to Neuralstem and its shareholders, and for her own personal benefit.

**Calice's Disclosure To Relative A**

43. While selling his Neuralstem shares on July 24, 2017, Calice tipped Relative A about the upcoming negative news, and Relative A immediately sold all 4,739 shares of his own Neuralstem stock that day, avoiding losses of $14,434.

44. Calice and Relative A had a close personal relationship dating back to Calice's childhood. Relative A had invested in Neuralstem, in part, because Hand was a project manager there, and Calice knew that Relative A owned Neuralstem stock when Calice called Relative A several times on July 24, 2017. Calice also knew that Relative A would lose money when the negative clinical trial results were publicly disclosed if Relative A did not sell his stock beforehand.

45. Calice knowingly or recklessly disclosed material nonpublic information to Relative A about Neuralstem that Hand had communicated to Calice in breach of her duty of confidentiality to Neuralstem. Calice did so for his own personal benefit because of his close personal and familial relationship with Relative A, and Calice did so with the expectation of providing a benefit to Relative A.

46. When Calice conveyed material nonpublic information about Neuralstem to Relative A, Calice knew, or recklessly disregarded, that Relative A would use that information to trade securities.

### FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act**
**(Both Defendants)**

47. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 46 of this Complaint.

48. Calice and Hand, directly or indirectly, singly or in concert, in the offer or sale of

securities, by the use of means or instruments of transportation or communication in interstate commerce, or by use of the mails, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

49. By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Both Defendants)

50. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 46.

51. Calice and Hand, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities by the use of means or instrumentalities of interstate commerce, or by use of the mails or the facilities of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon other persons.

52. By reason of the foregoing, the Defendants, directly or indirectly, singly or in

concert, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

**I.**

Permanently restraining and enjoining the Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**III.**

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York  
       June 7, 2021

Respectfully submitted,

/s/ Richard R. Best

Richard R. Best  
Sanjay Wadhwa  
George N. Stepaniuk  
Cynthia A. Matthews  
Counsel for Plaintiff  
U.S. Securities and Exchange Commission  
New York Regional Office  
200 Vesey Street, Suite 400  
New York, New York 10281-1022  
(212) 336-0132 (Matthews)  
matthewsc@sec.gov